[Crim. No. 9852. First Dist., Div. One. Dec. 23, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
MICHAEL HENRY METZGER, Defendant and Respondent.

## Counsel

Evelle J. Younger, Attorney General, Robert R. Granucci and Jerome C. Utz, Deputy Attorneys General, for Plaintiff and Appellant.

Patrick Sarsfield Hallinan, Hallinan, Rice, Metzger & Hallinan, William O. Weissich, David L. Kelly and Rommel Bondoc for Defendant and Respondent.

## Opinion

**ELKINGTON, J.**—Defendant Michael Metzger was charged with narcotic and other offenses by a grand jury indictment. The evidence on which the indictment was based was seized in his home under authority of a search warrant. The superior court on a Penal Code section 1538.5 motion ordered the evidence suppressed. Concededly insufficient evidence to support a conviction remained; accordingly an order dismissing the action under Penal Code section 1385 was entered. The People appeal from the dismissal order, as permitted by Penal Code section 1238, subdivision (7).

The evidence before the superior court on the Penal Code section 1538.5 motion to suppress may be stated as follows.

One Gerald McDonald had been a paid informer for the United States Customs Service. He was arrested in Marin County on charges relating to possession of stolen property. Thereafter he was used by the county police authorities "to gain information" and was paid for his services. Among other things he told the police that he had seen marijuana, cocaine and

hashish at Metzger's home. Metzger, he said, would go down stairs with keys and bring back small amounts of the narcotics "and people there would partake of it." The officers suggested to him that he telephone Metzger, who was an attorney at law, pose as a potential client and endeavor to be invited into the lawyer's home where he might observe and later report the presence of narcotics. McDonald made the telephone call and after some conversation was invited to come to Metzger's office the following week. However, the following afternoon McDonald went to Metzger's home and knocked on the door. Metzger opened the door and said, "Hi Jerry." McDonald replied, "What's doing, Mike," whereupon Metzger said, "Come on in." "During his conversation with the said Michael Metzger, he observed Metzger produce a handrolled cigarette and smoke the same. He recognized the cigarette from its odor and appearance to be a marijuana cigarette. The confidential reliable informant has used marijuana himself in the past and has observed marijuana on numerous occasions and is well familiar with its appearance and its odor." McDonald thereafter reported his observation to the officers; when he did, they smelled the odor of marijuana smoke on his clothing. He was in fact a "reliable informer, having given the police truthful information in the past. He was paid $50 for the Metzger job; besides that he was promised nothing by the officers. The officers made no deal to dismiss the receiving stolen property charge against him; this charge was nevertheless later dismissed.

Metzger contends that a Fourth Amendment violation resulted from the means used in securing entry into his home. No contention is made of an invalid search or seizure or other constitutional breach *after the entry,* as condemned in *Gouled* v. *United States,* 255 U.S. 298 [65 L.Ed. 647, 41 S.Ct. 261]. After the entry McDonald observed only that which was in plain sight; such an observation is not a search. (*People* v. *Roberts,* 47 Cal. 2d 374, 379 [303 P.2d 721]; *People* v. *Jackson,* 14 Cal.App.3d 57, 66-67 [92 Cal.Rptr. 91].)

Police practices such as are here in question have been called "dirty business" and are offensive to many people. Nevertheless they may not reasonably be considered as unrelated matters, but rather in the context of the unquestioned need to cope with growing criminal aggression in our state and nation. And because our decisions announce law which is generally applicable, care should be taken that we be not swayed by persons, or kinds or levels of criminal activity, and thus create bad law.

Although, as is well known, many police practices have been found constitutionally impermissible, there is nothing *inherently* unlawful in the use of police deceit for the purpose of suppressing crime and apprehending criminals. A rule, which so far as we know has never been questioned, was

stated in 1932 by Chief Justice Hughes in *Sorrells* v. *United States,* 287 U.S. 435, 441-442 [77 L.Ed. 413, 416-417, 53 S.Ct. 210, 86 A.L.R. 249], as follows: "Artifice and strategem may be employed to catch those engaged in criminal enterprises. . . . The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. . . ."

Yet when the police "artifice" or "strategem" has the effect of invading guaranteed constitutional rights, it must be so held, and any evidence obtained as a result must be suppressed.

The factual situation presented to us may reasonably be condensed to the following. Law enforcement authorities arranged for (1) a willing informer (2) who was personally known to one suspected of engaging in criminal activity (3) to be invited into the home of that person (4) by means of deception as to his motive (5) for the purpose of observing such criminal activity and reporting it to the authorities, (6) which information, but for the questioned entry, was not unconstitutionally obtained.

Our task is to determine which side of the line between permissible, and constitutionally proscribed, police activity the facts of this case fall. That line is not easily found; it has been the subject of conflicting decisions and discussion, and many reasonable men have disagreed.

In our inquiry the controlling authority on the constitutional issue involved is, of course, the United States Supreme Court (*Chesapeake & Ohio Ry.* v. *Martin,* 283 U.S. 209 [75 L.Ed. 983, 51 S.Ct. 453]; *Perkins Mfg. Co.* v. *Jordan,* 200 Cal. 667, 678-679 [254 P. 551]); and as to that court, its later decisions must be deemed to have superseded any earlier contrary authority. (*Asher* v. *Texas,* 128 U.S. 129, 131 [32 L.Ed. 368, 369, 9 S.Ct. 1]; *Estate of Keig,* 59 Cal.App.2d 812, 816-817 [140 P.2d 163]; *People* v. *Bateman,* 57 Cal.App.2d 585, 587 [135 P.2d 192].)

*United States* v. *White* (1971) 401 U.S. 745 [28 L.Ed.2d 453, 91 S.Ct. 1122], appears to be the most recent relevant authority. In that case a willing informer who was known to White, concealing his purpose and police connections, by invitation entered the home of White, whom he engaged in incriminating conversations which were transmitted to outside police by means of a concealed electronic device. No Fourth Amendment intrusion was found. Citing *Lewis* v. *United States,* 385 U.S. 206 [17 L.Ed.2d 312, 87 S.Ct. 424], the court said (p. 749 [28 L.Ed.2d at p. 457]), "No warrant to 'search and seize' is required in such circumstances, nor is it when the

Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics . . . ." In such a situation, it was stated, where one trusts an apparent colleague ". . . 'no interest legitimately protected by the Fourth Amendment is involved,' for that amendment affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' *Hoffa* v. *United States* [385 U.S.] at 302, . . ."

We are unable to observe any substantial distinguishable factual difference between *United States* v. *White* and the case before us. There also (1) a willing informer (2) personally known to White (3) was invited into White's home (4) by means of deception as to his motive (5) for the purpose of reporting criminal activity to government agents, (6) and but for the questioned entry no constitutional violation occurred.

*Hoffa* v. *United States* (1966) 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408], was relied upon by the court in *United States* v. *White*. One Partin, a union official and a government informer, was personally known to Hoffa. "Deceptively" (as to his purpose and government connections) Partin and government agents arranged for him to be in Hoffa's "hotel suite by invitation"[1] over an extended period of time for the purpose of observing and reporting any criminal activity of Hoffa. In the hotel suite Partin observed criminal activity of Hoffa which he reported to the agents. It was urged that the admission at Hoffa's later trial of evidence of Partin's observations was, because of the "deceptive" means used to gain entry to Hoffa's suite and presence, violative of the Fourth Amendmant. Here again although the factual context also closely parallels that of the case at bench, no Fourth Amendment violation was found.

The court pointed out that (p. 302 [17 L.Ed.2d at p. 382]): "Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing. . . ." It was then stated: "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. . . ."

*On Lee* v. *United States* (1951) 343 U.S. 747 [96 L.Ed. 1270, 72 S.Ct.

[1]A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office. (*United States* v. *Jeffers*, 342 U.S. 48 [96 L.Ed. 59, 72 S.Ct. 93]; *People* v. *Tarantino*, 45 Cal.2d 590 [290 P.2d 505].)

967]: On Lee, a laundryman, had his living quarters in the rear of the laundry. Suspicious of his dealings, the government employed On Lee's "old acquaintance and former employee," Chin Poy, as a "stool pigeon." Chin Poy on several occasions "sauntered in and, while customers came and went," engaged On Lee in incriminating conversations which were transmitted by radio to outside agents. The court said (pp. 751-752 [96 L.Ed. at p. 1274]) that the conduct of the government and Chin Poy "did not amount to an unlawful search and seizure such as is proscribed by the Fourth Amendment. . . . Chin Poy entered a place of business with the consent, if not by the implied invitation" of On Lee.

From the foregoing high authority, which is wholly binding upon us, it becomes clear that no Fourth Amendment taint attended the means by which, in the case before us, McDonald gained entry into defendant Metzger's home.

Support for Metzger's contention is claimed in the earlier case of *Gouled* v. *United States, supra,* 255 U.S. 298. But there the factual context is completely dissimilar from those of the foregoing authorities and of the case at bench. A business acquaintance of Gouled, acting under orders of federal officers, gained entry into Gouled's office by falsely pretending to pay a social visit. The intruder then secretly ransacked the office finding incriminating documents. It was this latter conduct, clearly a constitutionally banned governmental search and seizure, that the court found objectionable. (And see discussion of *Gouled* in *Lewis* v. *United States, supra,* 385 U.S. 206, 209-210 [17 L.Ed.2d 312, 315].) Here the informer McDonald entered upon no search or seizure within the home; he did no more than observe Metzger engage in criminal activity.

We now consider other authority relied upon by Metzger.

*People* v. *Reeves,* 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393], in no way contradicts the holdings of *White, Hoffa* and *On Lee.* In *Reeves* a hotel manager was induced by police to advise a room tenant falsely that an expected registered letter had arrived downstairs. As the tenant's door was opened police waiting outside observed narcotics inside. In no sense could the police be considered invitees of the hotel guest. No trust was reposed in an apparent friend or colleague, nor was there a "wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." (See *United States* v. *White, supra,* 401 U.S. 745.)

The reliance on *People* v. *Mesaris,* 14 Cal.App.3d 71 [91 Cal.Rptr. 837], *In re Robert T.,* 8 Cal.App.3d 990 [88 Cal.Rptr. 37], *People* v. *Miller,* 248 Cal.App.2d 731 [56 Cal.Rptr. 865], *People* v. *Porter,* 227 Cal.App.2d

211 [38 Cal.Rptr. 621], *Fraternal Order of Eagles, No. 778* v. *United States,* 57 F.2d 93, *United States* v. *Reckis,* 119 F.Supp. 687, *United States* v. *Guerrina,* 112 F.Supp. 126, *United States* v. *Mitchneck,* 2 F.Supp. 225, is also misplaced. In none of these cases was there the "misplaced belief that a person to whom [one] voluntarily confides his wrongdoing will not reveal it." In *Mesaris,* plainclothes police gained entrance by pretending a need to talk to a repairman in the house. *Robert T.'s* plainclothes policeman named "Melvin" was introduced as " 'My friend Joe' " by the landlord; he walked into the apartment with the landlord pretending a check to see if the tenant had "sublet." In *Miller,* police went to his room with the landlord who knocked and said, " 'You have a caller.' " Police saw narcotics when the door was slightly opened. In *Porter,* police and federal agents rang a door bell and then answered " 'Yes' " to the question " 'Is that you, Bill?' " In *Fraternal Order of Eagles,* prohibition agents falsely gained entrance by posing as brother Eagles. In *Reckis* a federal agent gained entry by saying, "The boss sent me down to fix the still." *Guerrina* concerned an invited civil tax agent who surreptitiously brought in a criminal agent for a criminal investigation. And in *Mitchneck,* prohibition agents gained entry by falsely posing as refrigerator salesmen having mutual acquaintances with Mitchneck.

Metzger's secondary contention in the superior court Penal Code section 1538.5 proceedings was that the affidavit purporting to support the subject search warrant was insufficient as a matter of law.

As relevant, the affidavit dated December 6, 1970, of a police officer, alleged receipt of information from a person, previous information from whom had been correct and reliable and had twice resulted in arrests. The informer related to the officer: that on two occasions in June and July 1970 he had "observed small quantities of hashish, marijuana and cocaine being used by the occupants of [Metzger's] residence, all of which had been produced by the said Michael Metzger"; that on or about December 6, 1970, he was in the residence of Metzger for about one-half hour during which time he observed Metzger produce a hand-rolled cigarette and smoke the same; that he recognized the cigarette from its odor and appearance to be a marijuana cigarette; and that he "has used marijuana . . . on numerous occasions and is well familiar with its appearance and its odor." The police officer affiant himself alleged that when the informer "exited [from] the residence he [the officer] could detect upon [the informer's] person and clothing the odor of burned marijuana which was not present when he entered the residence."

Metzger's argument is that from the allegations that he "produced" the described narcotics in his home it could not reasonably be inferred that

additional narcotics were to be found therein. The superior court found against Metzger on this issue, concluding that the affidavit "probably is sufficient." We find ourselves in agreement with the superior court.

In making this determination we are bound by certain rules recently reiterated in *Skelton* v. *Superior Court,* 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485], as follows: "[W]hen a search is based on a warrant (and therefore on a magistrate's rather than a police officer's determination of probable cause) the reviewing courts 'will accept evidence of a less "judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant." . . .' In determining the sufficiency of an affidavit for the issuance of a search warrant the test of probable cause is approximately the same as that applicable to an arrest without a warrant, a commitment by a magistrate or an indictment by a grand jury . . . , namely, whether the facts contained in the affidavit are such as would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion of the guilt of the accused. . . . The rules of appellate review recognize the impracticality of establishing a precise calculus by which the existence of probable cause is to be determined: the warrant can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause, since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit as well as when presented by oral testimony."

Here a reliable police agent, six months before in Metzger's home, had seen Metzger produce three kinds of narcotics which were then used by the building's occupants. On the day of the affidavit he had again seen Metzger produce and use a narcotic in his home. We cannot say, as a matter of law, that the magistrate as an ordinarily prudent and cautious man could not "believe, and conscientiously . . . entertain, a strong suspicion" that narcotics were being kept by Metzger in his home. It is true as argued by Metzger that the narcotics could have been produced from his person, and not otherwise from within his home. But the magistrate could reasonably have inferred that Metzger, a lawyer, did not customarily carry narcotics on his person.

The order of dismissal is reversed.

Molinari, P. J., and Sims, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 8, 1972. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.