[Crim. No. 23609. Second Dist., Div. Five. July 22, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD McCOY, Defendant and Appellant.

## COUNSEL

Nancy Kelso, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Jack T. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.**—By information, defendant and codefendant (not a party to this appeal) were charged in count I with offering to sell and having sold a restricted dangerous drug (sodium secobarbital), in violation of Health and Safety Code section 11912 (now § 11379), and in count II, with unlawful possession of marijuana, in violation of Health and Safety Code section 11530 (now § 11357). The jury found defendant guilty of possession of a restricted dangerous drug, a necessarily included but lesser offense than that charged in count I. Defendant was acquitted of the

offense charged in count II. Defendant's application for probation was denied and he was sentenced to state prison for the term prescribed by law.

Officer Carter of the Los Angeles County Sheriff's Department arranged through a reliable informant to purchase from defendant a quantity of "red devils" (a street name for sodium secobarbital). While Carter and the informant were driving to the place where the sale was to take place, the informant observed defendant, who was seated in a car which was parked in front of a house. After Carter stopped the car and the informant had spoken with defendant, Carter and the informant followed defendant to the rear of the house, where there was a detached room. Carter and the informant entered. Several minutes later, defendant appeared with a large quantity of red capsules in a bag. While defendant counted out some capsules from the bag, Carter (who was wired for sound) gave a prearranged signal to the surveillance team of officers to converge and make the arrests. Officer Feiga and other officers arrived at the scene and entered the room when the door was opened as they approached. Feiga observed defendant squatting on a mattress with a large paper bag between his legs containing approximately 1,000 red capsules. There was also a quantity of red capsules in his hand and in a sandwich bag on a nightstand.[1] Thereupon defendant was arrested.

Defendant's first contention is that his counsel's stipulation as to the chemical composition of the contraband deprived him of his right to confrontation of witnesses. Basically, defendant contends that *Boykin* v. *Alabama,* 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] is applicable where an accused is denied his right of confrontation as a result of his counsel's stipulation which precludes jury consideration of a material element of the offense.

In *People* v. *Chasco,* 276 Cal.App.2d 271 [80 Cal.Rptr. 667], this court considered the identical contention now raised by defendant. In rejecting the validity of this contention, we held (at pp. 273-274): "Turning to the alleged lack of authority of counsel to stipulate to a 'crucial' fact, it is sufficient to say that while proof of the chemical composition of the powder was certainly essential to the People's case, defendant's denial of any connection with it relegated the issue to a subsidiary role. In the *Harness* [v. *Pacific Curtainwall Co.,* 235 Cal.App.2d 485 (45 Cal.Rptr. 454)] case, on which defendant relies, it was held that an attorney did not have the right to stipulate away his client's only interest in the litigation. The distinction is obvious." While acknowledging that there was some

---

[1]By subsequent chemical analysis, the red capsules were determined to contain sodium secobarbital.

substance to defendant's argument that *Boykin* required a showing of waiver, this court noted (at pp. 275-276): "The solution lies not in logic, but in practicalities. After all, the question is not whether the courts should permit a deprivation of a federal constitutional right to go without redress; rather it is the extent to which, on direct appeal, the trial record must negative possible violations. In *Boykin* the court held that when the conviction is based on a guilty plea, the record must so show; but, as the dissent points out, even if the court had held otherwise, Boykin could have attempted to establish in habeas corpus proceedings that he pleaded in ignorance. As long as collateral relief is available the question becomes simply this: when does the need of the trial court to get on with its business take a back seat to the desirability of negativing the need for such further proceedings. [¶] In this case we deal with a simple stipulation of fact, not fatal to the defense or even contradictory to the defendant's position at the trial. We are convinced that in such a case the Constitution does not demand affirmative demonstration that it has not been violated. Just where the line between a guilty plea and a stipulation of fact such as ours should be drawn, we need not attempt to determine. There may be stipulations of fact so destructive of the accused's position at the trial that to permit them to be made without a showing of his intelligent consent is to court reversal. This is not such a case. [Fns. omitted.]"

The development of the law with respect to when the policies enunciated in *Boykin* are applicable does not convince us that the ruling in *Chasco* is not still viable. *Boykin* has been extended to situations which are the functional equivalent of a plea of guilty, such as the submission of the case on the preliminary transcript or a "slow plea." (*In re Mosley,* 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473].) In the recent case of *In re Yurko,* 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 561], our Supreme Court extended *Boykin* to situations where the defendant is called upon to plead to a charge of having suffered a previous felony conviction. In holding that there must be a specific and express showing that defendant waived his constitutional rights attendant to an admission of prior felony convictions, the court stated (at p. 862): "The admission of the truth of the allegation of prior convictions has been differentiated from a plea of guilty through a characterization of the former as merely allowing a determination of a 'status' which can subject an accused to increased punishment. (See *In re McVickers* (1946) 29 Cal.2d 264 [176 P.2d 40]; *People* v. *Franco* (1970) 4 Cal.App.3d 535 [84 Cal.Rptr. 513].) Although this may be technically correct, the distinction is meaningless if, as in the case of a plea of guilty, the accused nevertheless will be held to have waived, without

proper protections, important rights by such an admission. Undoubtedly the particular rights waived by an admission of the truth of the allegation of prior convictions are important. Although there is not at stake a question of guilt of a substantive crime, the practical aspects of a finding of prior convictions may well impose upon a defendant additional penalties and sanctions which may be even more severe than those imposed upon a finding of guilt without the defendant having suffered the prior convictions. Thus a finding of prior convictions may foreclose the possibility of probation (§ 1203), may extend the term for the basic crime to life imprisonment (§ 644), and may substantially extend the time served on such a life sentence before the defendant becomes eligible for parole (§§ 3046-3048.5)." We do not believe that the factors which influenced the *Yurko* court to apply the *Boykin* rules to admissions of priors necessitate the same approach to the question of stipulations of counsel to certain *factual* matters. A decision not to require the People to prove by expert testimony the forbidden status of the seized substance does not amount to a significant deprivation of a defendant's constitutional rights. Absent an attack upon the accuracy of the test performed or other error in connection with the determination of the chemical composition of the evidence, defense counsel and defendant have nothing to gain by a refusal to stipulate.[2] Indeed, where counsel knows that the seized substance is what the chemist will say it is and counsel cannot hope to discredit that conclusion, a stipulation generally avoids the dramatization of the nature of the substance before the jury. The decision by counsel to enter into the type of stipulation here in question parallels the type of tactical decisions which counsel must make as to which witnesses to call on defendant's behalf and to what extent the People's witnesses are to be cross-examined. These aspects of counsel's professional discretion do not lend themselves to the strictures attendant to a guilty plea or its equivalent. ■ Under the standard that the assistance of counsel must be commensurate with the due process right to fair trial (*People* v. *Sharp*, 7 Cal.3d 448 [103 Cal.Rptr. 233, 499 P.2d 489]; *People* v. *Ibarra*, 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]), it cannot be said that every tactical trial decision must be reviewed by the defendant and only allowed where his consent is secured and expressly set

---

[2] In the case at bar the defense contended at trial that the informant asked defendant to keep the contraband for him for a period of time; that the capsules which defendant was counting out when he was arrested represented a gratuity given to him by the informant for the holding of the contraband, and were for defendant's own use. As is evident from the testimony, the stipulation given by defense counsel was not inconsistent with or prejudicial to the theory of the defense.

forth in the record.[3] (Cf., *Henry* v. *Mississippi,* 379 U.S. 443, 451 [13 L.Ed.2d 408, 414-415, 85 S.Ct. 564].)

■ Defendant next contends that his motion to dismiss the information (Pen. Code, § 995) should have been granted because (1) the stipulation relative to the chemical nature of the seized substance was invalid, hence the evidence was not properly before the court; and (2) since the entry by the police officers was in violation of Penal Code section 844, the evidence thereby obtained (secobarbital) was therefore inadmissible.[4] for the reasons heretofore stated, we find no merit in contention (1). Contention (2) is likewise without merit.

The requisites for a lawful entry to effect an arrest are set forth in Penal Code section 844.[5] In the instant case the record clearly shows that section 844 was inapplicable because the entry was by consent.[6] (*Mann* v. *Superior*

---

[3]For example, in *People* v. *Cheatham,* 263 Cal.App.2d 458, 463 [67 Cal.Rptr. 679], it was argued that a voluntary confession made to an ordinary witness might have been illegally obtained because the record did not affirmatively show that the person to whom it was made, and who had not advised the defendant of his constitutional rights, was not a policeman. The logical extension of defendant's point would require the trial court to determine the status of the person to whom the confession is made so that, if it was a policeman, it could then explain to the accused that his attorney can object to the admissibility of the confession. Only then can the accused intelligently waive his right to keep the confession out.

[4]On appeal from a judgment of conviction, defendant is entitled to a review of the denial of his section 995 motion. (*People* v. *Triggs,* 8 Cal.3d 884 [166 Cal.Rptr. 408, 506 P.2d 232].) Moreover, on appeal the question of the admissibility of the evidence found to support the information may be challenged. (*People* v. *Scoma,* 71 Cal.2d 332 [78 Cal.Rptr. 491, 455 P.2d 419]; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 271 [294 P.2d 23].)

[5]Penal Code section 844 provides: "To make an arrest . . . a peace officer may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

[6]In answer to the questions shown, Officer Feiga testified as follows:
"Q. What did you do upon receiving [the prearranged signal to make the arrests]?
"A. Upon receiving the signal I advised the other surveilling officers to respond to the location, which was a small room at the rear of 11806 South Holmes Avenue to effect the arrest of the defendant McCoy.
"Q. Did you go to that residence?
"A. . Yes.
"Q. What did you do when you arrived there?
"A. Upon arriving at the location, I was briefly preceded by Deputy Carroll, who went by the door. At that time there was a sound of scuffling or loud noise and the door opened and I walked in and advised the people that I was a deputy sheriff conducting a narcotic investigation and that defendant McCoy was under arrest for the violation of the state narcotic laws.
". . . . . . . . . . . . . . . . . . .
"Q. You approached the door with Deputy Carroll; is that correct, after you

*Court,* 3 Cal.3d 1, 9 [88 Cal.Rptr. 380, 472 P.2d 468]; *People* v. *Johnson,* 15 Cal.App.3d 936 [93 Cal.Rptr. 534].)

██ On review of a denial of a 995 motion, the appellate court will view the evidence in the light most favorable to the order and will uphold the findings as long as they are supported by substantial evidence. (*People* v. *Hall,* 3 Cal.3d 992, 999 [92 Cal.Rptr. 304, 479 P.2d 664].) On appeal it is to be assumed that the magistrate impliedly found every fact necessary to support its ruling to be true. (*People* v. *Castaneda,* 1 Cal.App.3d 477, 483-485 [82 Cal.Rptr. 205].) ██ In the instant case Feiga testified that as the officers approached the detached room after the signal to arrest was given by Carter, they saw the door in the process of being opened. Upon entering the room the officers observed defendant and his girl friend (codefendant) against the far wall. Defendant was squatting on the floor, and his girl friend was assisting him in removing and counting the red capsules which contained the restricted dangerous drug. Since there were only four persons in the room and two of them, defendant and codefendant, were in no position to open the door, the conclusion that either Carter or the informant was the individual who opened the door appears inescapable. Moreover, since Carter was an undercover officer and the informant was a party to the investigation, it is reasonable to assume that both knew of the presence of the surveillance team of officers and the prearranged

---

received this signal?
"A. Yes.
"Q. How long did it take you to get through the door after you received this signal?
"A. Some two to three minutes, I suppose.
"Q. Who else was with you besides yourself and Deputy Carroll?
"A. Deputy Iavelli, Deputy Hardy and his partner, Deputy Williams and his partner.
"Q. Who was the first person through the door?
"A. Iavelli was the first person through the door of the small room.
"Q. You all approached in one group; is that right?
"A. Yes.
"Q. Was the door open when you approached it?
"A. Yes.
"Q. Wide open?
"A. It was halfway in an open position in the process of being opened from the inside, it appeared to me.
"Q. It looked like somebody was opening the door?
"A. Yes.
"Q. How far were you from Deputy Iavelli when he entered the location?
"A. I was right on him, a matter of inches.
"Q. Were you running or walking?
"A. Walking in a brisk manner.
"Q. And you walked in a brisk manner up to the door and through the door; is that correct?
"A. Yes."

signal to arrest. Thus the opening of the door by either of them would provide an affirmative act which made compliance with section 844 unnecessary. So far as the approaching officers were concerned, they could reasonably conclude that consent for entry had been given. (*People* v. *Harrington,* 2 Cal.3d 991, 995 [88 Cal.Rptr. 161, 471 P.2d 961].) So far as the persons inside were concerned, the fact that Carter was already lawfully within the building eliminated the underlying purpose for section 844 compliance. Under the particular circumstances here present, with Carter in the same room with defendant, there was no likelihood of physical danger when the other officers entered unannounced. The sole remaining issue is whether the informant and Carter were on the premises illegally because Carter's[7] presence in the room had been effectuated by trickery or ruse, in violation of section 844.[8] In the instant case, Carter's entry was not for the purpose of personally arresting anyone within the dwelling. His purpose was to observe and report on criminal behavior and assist in the accomplishing of the arrest of defendant by fellow officers. Such undercover activity by Carter does not require that he divulge his true identity. (See *Hoffa* v. *United States,* 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408]; *People* v. *Metzger, supra,* 22 Cal.App.3d 338; *People* v. *Veloz,* 22 Cal. App.3d 499 [99 Cal.Rptr. 519].) As stated by the United States Supreme Court in *United States* v. *White,* 401 U.S. 745, 749 [28 L.Ed.2d 453, 457, 91 S.Ct. 1122]: "The Court of Appeals understood *Katz* to render inadmissible against White the agents' testimony concerning conversations that Jackson broadcast to them. We cannot agree. *Katz* involved no revelation to the Government by a party to conversations with the defendant nor did the Court indicate in any way that a defendant has a justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversation to the police. [¶] *Hoffa* v. *United States,* 385 U.S. 293 (1966), which was left undisturbed

---

[7]For the purposes of determining whether the rights guaranteed by the Fourth Amendment have been violated, the use of informants operating under the direction and control of police agencies constitute state action. (*Irwin* v. *Superior Court,* 1 Cal.3d 423 [82 Cal.Rptr. 484, 462 P.2d 12]; *People* v. *Tarantino,* 45 Cal.2d 590 [290 P.2d 505]; *People* v. *Buchanan,* 26 Cal.App.3d 274 [103 Cal.Rptr. 66]; *People* v. *Mangiefico,* 25 Cal.App.3d 1041 [102 Cal.Rptr. 449].) It is clear that in the instant case the informant was under the control of the police. Thus, rather than refer to both Carter and the informant in our discussion, reference to Carter will be deemed to include both. Analysis of the issues will likewise be applicable to both.

[8]It is apparent that the informant was not in the room for any purpose connected with the arrest other than to act as a go-between to arrange the illicit transaction. In any event, where police have arranged for an informant to be invited into a defendant's dwelling to observe criminal activity, the entry is not illegal. (*United States* v. *White,* 401 U.S. 745 [28 L.Ed.2d 453, 91 S.Ct. 1122]; *People* v. *Metzger,* 22 Cal. App.3d 338, 341 [99 Cal.Rptr. 264].)

by *Katz,* held that however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities. In these circumstances, 'no interest legitimately protected by the Fourth Amendment is involved,' for that amendment affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' *Hoffa* v. *United States,* at 302. No warrant to 'search and seize' is required in such circumstances, nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused, *Lewis* v. *United States,* 385 U.S. 206 (1966), or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence. *Lopez* v. *United States,* 373 U.S. 427 (1963)." To hold, as defendant urges, that the undercover officer was illegally on the premises would result in effectively crippling undercover investigations undertaken by the police. We fail to see what benefit would accrue.

We are of the opinion that statements in *Mann* v. *Superior Court, supra,* 3 Cal.3d 1, do not necessitate a ruling to the contrary. In *Mann* the court stated (at p. 9): ". . . [P]etitioners contend that the officers obtained their consent to enter by subterfuge and fraud, and that the consent was therefore invalid. (*People* v. *Reeves* (1964) 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393].) There is no merit in this contention. [¶] Cases holding invalid consent to entry obtained by ruse or trick all involve some positive act of misrepresentation on the part of the officers, such as claiming to be friends, delivery men, managers, or otherwise misrepresenting or concealing their identity. (*People* v. *Reeves, supra,* 61 Cal.2d 268; *People* v. *Miller* (1967) 248 Cal.App.2d 731 [56 Cal.Rptr. 865]; *People* v. *Porter* (1964) 227 Cal.App.2d 211 [38 Cal.Rptr. 621]; *People* v. *Hodson* (1964) 225 Cal.App.2d 554 [37 Cal.Rptr. 575]; *Fraternal Orders of Eagles, No. 778* v. *United States* (3d Cir. 1932) 57 F.2d 93; see also *People* v. *Lopez* (1969) 269 Cal.App.2d 461, 466-467 [74 Cal. Rptr. 740]; *People* v. *Sanford* (1968) 265 Cal.App.2d 960, 965-966 [71 Cal.Rptr. 790].) Here there was no such form of active deception. Nor can the timing of the officers' knocking be deemed a form of deception by taking advantage of circumstances. There is nothing whatsoever in the record to indicate that by knocking shortly after guests had entered, the officers implied that they too were invited guests. Moreover, there was no password, no special way of knocking that the officers learned by watching the guests and which, had they imitated, might have been the basis

for finding that they misrepresented their identity and deceived the occupants of the house. For these reasons, we hold that the officers acted in a perfectly straightforward and undeceiving way in seeking entry as they did, when they did."

*Mann* did not deal with the question of an entry under section 844. While the court used the word "entry" and thus perhaps raised the suggestion that it was speaking in the context of section 844, reference to the cases relied upon in *Mann* makes it clear that the court was concerned with the validity of a "consent search" where the consent to enter and conduct the search is obtained by trickery and deception.[9] (See *People* v. *Veloz, supra,* at p. 502.) ■ However, as stated in *People* v. *Superior Court (Fall)* 31 Cal.App.3d 788, 797 [107 Cal.Rptr. 756]: " 'The right protected by Penal Code section 844, while substantial, is of a lesser magnitude than that protected by the more general requirement of probable cause for a search. The section in essence requires that the occupant of premises be given notice before the police break into it. Its purpose is to minimize "the consequences of an unannounced intrusion" and the consequent "resistance to the intruders and violent death or injury to them or others including innocent third parties." [Citations.]' "

Artifice and stratagems have long been recognized as proper methods to be employed to catch those engaged in criminal activities (*People* v. *Metzger, supra; People* v. *Veloz, supra;* see also *Sorrells* v. *United States,* 287 U.S. 435, 441-442 [77 L.Ed. 413, 416-417, 53 S.Ct. 210, 86 A.L.R. 249]) as long as constitutional rights are not invaded. Defendant has not substantiated his claim that such an invasion was occasioned by the police conduct which led to his arrest.

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 19, 1974. Wright, C. J., Tobriner, J., and Sullivan, J., were of the opinion that the petition should be granted.

---

[9]Consent to enter secured by deception or trickery may not be used to justify the subsequent search of the premises. (*Mann* v. *Superior Court, supra; People* v. *Reeves,* 61 Cal.2d 268 [38 Cal.Rptr. 1, 291 P.2d 393].)