[Crim. Nos. 8295, 8300. Third Dist. Feb. 7, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES WILLIAM MACK et al., Defendants and Appellants.

**COUNSEL**

James D. Garbolino, G. Dave Teja and Duane C. Miller, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller, Monte B. Lake and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PUGLIA, P. J.**—Defendants were jointly charged with burglaries of the Conklin and Whitney residences (Pen. Code, § 459, two counts) and with knowingly receiving property stolen therefrom as well as from a burglary of the King residence (Pen. Code, § 496, three counts). Davidson alone was charged with burglary of the King residence.

Prior to trial, defendants moved the superior court to suppress certain evidence (Pen. Code, § 1538.5). The motions were submitted upon the testimony taken at the preliminary hearing supplemented by additional evidence. The motions were denied.

Thereafter Mack pled guilty to one count of receiving stolen property (taken in the King burglary). The record discloses no disposition of the People's motion to dismiss the remaining charges as to Mack, who was sentenced to state prison. His appeal is limited to the validity of the order denying the motion to suppress. (Pen. Code, § 1237.5; rule 31(d), Cal. Rules of Court.)

Davidson proceeded to trial. He was found guilty of the Conklin and Whitney burglaries (in the first and second degrees respectively) and one

count of knowingly receiving stolen property (taken in the King burglary). He was acquitted of the remaining charges. Davidson was also sentenced to state prison. He appeals from the judgment.

On appeal, defendants join in attacking (1) the detention and arrest of Mack and the contemporaneous search of his person; (2) the entry and search of the residence at 34th and "W" Streets; (3) the "search" of the Cotnam residence; and (4) the search of the Solano Street residence.

In addition, Davidson claims that errors were committed at his trial. We shall deal with these contentions after we have disposed of the issues raised by the trial court's denial of the motions to suppress.

## ISSUANCE OF SEARCH WARRANT BY NONATTORNEY JUDGE

One of the contentions urged in connection with the search of the Solano Street residence, advanced by Davidson alone, is that issuance of a search warrant by a nonattorney judge results in a denial of due process. The search warrant for the Solano Street premises was issued by a lay judge of the justice court in Yolo County.

In *Gordon v. Justice Court* (1974) 12 Cal.3d 323 [115 Cal.Rptr. 632, 525 P.2d 72], the Supreme Court held that the right to due process guaranteed by the Fourteenth Amendment to the United States Constitution requires that an attorney-judge preside over misdemeanor criminal proceedings which may result in imposition of a jail sentence. (Pp. 326, 334.) The Supreme Court reasoned that in criminal trials, lack of legal training may so affect a lay judge's disposition of the technical and complex problems there encountered as to deny the defendant a fair trial. (Pp. 331-333.) In a pointed dictum, the court also projected a similar limitation upon felony preliminary hearings because of the obvious parallel between such proceedings and misdemeanor trials. (Pp. 326-327, fn. 2.)

A plenary trial conducted in the crucible of the adversary system thrusts upon the judge a wide range of complex decisions. (*North v. Russell* (1976) 427 U.S. 328 [49 L.Ed.2d 534, 96 S.Ct. 2709], dis. opn. of Stewart, J., at p. 339, [49 L.Ed.2d at p. 543]; *Gordon v. Justice Court, supra,* 12 Cal.3d at p. 332.) An application for search warrant, however, almost invariably is presented ex parte and turns upon the adequacy of the factual showing of probable cause for its issuance.

■ "Probable cause has . . . been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citation.]" (*People* v. *Ingle* (1960) 53 Cal.2d 407, 413 [2 Cal.Rptr. 14, 348 P.2d 577].) The magistrate need only determine whether the facts disclosed in the application for search warrant are sufficient to lead a man *of ordinary caution and prudence* to believe and conscientiously to entertain a strong suspicion that there is property subject to seizure in the place for which the warrant is sought. (*People* v. *Ingle, supra,* 53 Cal.2d at p. 412; *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *Superior Court (Brown)* (1975) 49 Cal.App.3d 160, 165 [122 Cal.Rptr. 459].)

■ There is nothing inherent in the process of determining probable cause that renders it beyond the capacity of lay persons to resolve. Our legal system has long entrusted nonlawyers to evaluate the legal significance of complex, factual data. For example, grand jurors determine probable cause to indict and trial jurors determine whether guilt is proved beyond a reasonable doubt. (*Shadwick* v. *City of Tampa* (1972) 407 U.S. 345, 351-352 [32 L.Ed.2d 783, 789, 92 S.Ct. 2119].) Each of these functions is at least as important as the determination of probable cause to issue a search warrant.

■ Furthermore, we are not blind to the fact, revealed by the most casual survey of the appellate reports over the two decades of California experience with the exclusionary rule (see *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]), that there is a marked absence of correlation between legal training and the ability unerringly to determine the existence of probable cause. More bluntly put, examples are not infrequently found in which the assessment of probable cause by a presumptively non-neutral law enforcement officer has been repudiated by a legally trained judicial officer only to be vindicated and reinstated thereafter by a higher court. In fact, the very provision by the Legislature for appellate review of trial court suppression orders adverse to the People (Pen. Code, § 1538.5) is implicit recognition that law trained judges can be wrong in determining whether or not probable cause has been shown. (22 Assem. Interim Com. Rep. (1965-1967) No. 12, Government Organization, pp. 15-16, 2 Appendix to Assem. J. (1967 Reg. Sess.).) Obviously, holders of a law degree have no corner on commonsense, the standard according to which affidavits for search

warrants are to be tested and interpreted (*United States* v. *Ventresca* (1965) 380 U.S. 102, 108 [13 L.Ed.2d 684, 689, 85 S.Ct. 741]; *People* v. *Superior Court (Johnson)* (1972) 6 Cal.3d 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183]).

In *Gordon*, the court expressly declined to "abolish the existing system permitting the use of non-attorney judges in all matters within the justice court jurisdiction." (*Gordon* v. *Justice Court, supra*, 12 Cal.3d at p. 333.) Apart from preliminary hearings, which resemble trials, we are unable to devine from the *Gordon* opinion a disposition to deny to lay justice court judges the powers confided to a magistrate (see Pen. Code, § 808; Witkin, Cal. Criminal Procedure (1963) Introduction, § 16, pp. 18-19). Moreover, the preference for search warrants is less an expression of faith in the technical expertise of the issuing judicial officer than a recognition that, unlike a police officer "engaged in the often competitive enterprise of ferreting out crime" (*Johnson* v. *United States* (1948) 333 U.S. 10, 13-14 [92 L.Ed. 436, 439-440, 68 S.Ct. 367]), he will approach the task in a neutral and detached manner. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 449-450 [29 L.Ed.2d 564, 572-573, 91 S.Ct. 2022]; see also *North* v. *Russell, supra*, 427 U.S. at p. 337 [49 L.Ed.2d at p. 541].) We conclude that the incapacitation of a lay judge in these circumstances is neither required by law nor justified by experience. ■ (See fn. 1.) Therefore the admission in evidence of property seized under a search warrant issued by a lay justice court judge does not violate defendant's right to due process of law.[1]

■ We turn next to the remaining contentions advanced relative to the trial court's denial of the motions to suppress. (Pen. Code, § 1538.5.) In so doing, we view the facts upon which the suppression motions were submitted in the light most favorable to the People, drawing therefrom all reasonable inferences in support of the trial court's order denying the motions. (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161].)

DETENTION, ARREST AND SEARCH OF MACK

■ On the afternoon of January 28, 1975, Officer Koupal was advised by telephone that suspicious activity was taking place at a

[1]The discussion just concluded furnishes the sole justification for publication of this opinion. The remaining questions with which we must treat in disposing of this appeal are neither new nor novel, but remain an unavoidable appendage to this opinion by force of the "all or nothing" character of the rules governing publication of appellate opinions. (See Cal. Rules of Court, rule 976.)

residence located at 34th and "W" Streets in Sacramento. The caller had been reporting to Koupal about activities at the residence over a period of approximately one year. Previous information related to dealing illicit drugs from the premises and the possible presence of stolen property there. Through his own investigation, Koupal had confirmed some of the information received. The information received on January 28th was that a red Volkswagen had arrived at the residence from which the driver and a female had removed stereo equipment and a TV set and taken them into the residence.

Working alone, Koupal went to the area and observed the Volkswagen. He followed the car as it drove away, observing it make an illegal "U" turn (Veh. Code, § 22103). After traveling several blocks, the Volkswagen stopped illegally in the middle of the street and picked up three passengers. (Veh. Code, § 22502.) Koupal stopped his unmarked police vehicle behind the Volkswagen and approached it with his police badge in hand. He identified himself and asked the driver of the Volkswagen, defendant Mack, for his driver's license. Mack was unable to produce a license or any other written evidence of identification. He identified himself verbally as James Mack. Koupal noticed an open can of beer on the passenger side of the vehicle in plain view. He asked Mack to get out of the car, patted him down for weapons and asked him to get into the police vehicle. Concerned for his own safety, Koupal did not inform Mack in the presence of his three companions that he was under arrest.

After Mack was in the police vehicle, Koupal arrested him for driving without a valid driver's license (Veh. Code, § 12500) and without a license in his possession (Veh. Code, § 12951), for having an open container of alcoholic beverage in the car (Veh. Code, § 23123) and for illegal "U" turn (Veh. Code, § 22103). Koupal did not have a citation book with him. His intent was to take Mack downtown and book him. He asked Mack to empty his pockets. Mack removed a few articles from his left front pants pocket and then turned his attention to his right front pants pocket. Koupal noticed a rectangular bulge in his left front pocket. He felt the outside of the bulge. It was a hard object. Koupal felt it was a container that might be holding a weapon of some type. He was concerned for his own safety because there were four potential adversaries at the scene. Furthermore, he contemplated transporting Mack downtown in an undercover police vehicle that did not have a security grill protecting the driver from passengers in the rear seat. He told Mack,

". . . you're not doing what I asked you, so I'll search you." Koupal reached into Mack's left front pants pocket and removed a stack of 12 credit cards. The issuee of the credit cards was Harold King. Koupal learned later that the cards had been stolen earlier that day in the burglary of the King residence.

Because the driver of the Volkswagen was committing a traffic offense in his presence (Veh. Code, § 22502), Officer Koupal had the right to approach the vehicle and detain the driver for purposes reasonably related to an investigation of the violation and the issuance of a citation or a warning. In this connection, the officer could require the driver to display his driver's license or other identification. (*People* v. *Grace* (1973) 32 Cal.App.3d 447, 452-453 [108 Cal.Rptr. 66].) Having approached the vehicle for that purpose, Officer Koupal observed in plain view an open container of alcoholic beverage in the vehicle, evidence of yet another misdemeanor traffic offense. (Veh. Code, § 23123.) Upon request, Mack was unable to produce a driver's license or other satisfactory evidence of his identity. As a result, the officer was required to take him into custody to be transported to the nearest or most accessible magistrate. (Veh. Code, § 40302, subd. (a).)[2] That exigency, of itself, warranted Koupal's pat-down search of Mack for weapons (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 538, 545 [119 Cal.Rptr. 315, 531 P.2d 1099]; *People* v. *Norman* (1975) 14 Cal.3d 929, 939 [123 Cal.Rptr. 109, 538 P.2d 237]).

Absent specific, articulable facts necessitating a more intensive intrusion, a search justified by the need to transport a misdemeanor traffic offender to a magistrate is limited to a pat-down of his outer clothing. (*People* v. *Brisendine, supra,* 13 Cal.3d at p. 545.) Under the circumstances shown here, it was not proper for the officer to extend the scope of the search to the entire contents of Mack's pockets. His direction to Mack to empty his pockets resulted therefore in an unlawful search.

It does not appear, however, that any of the items produced by Mack from his pockets upon command of Officer Koupal, constituted evidence of the charges against him or were in any way relevant to the

---

[2]Koupal testified that "Because he [Mack] was under arrest" his intention even before he discovered the credit cards was "to take him downtown and book him and completely search him, skin-search him." We decide under applicable rules of law whether the search of Mack at the scene was lawful. If it was, its validity is unaffected by Koupal's unexecuted intention later to conduct an unlawful search. (Cf. *People* v. *Leib* (1976) 16 Cal.3d 869, 875 [129 Cal.Rptr. 433, 548 P.2d 1105]: "Defendant cannot be arrested merely for having a guilty intent unless such intent is accompanied by a guilty act." (Fn. omitted.).)

prosecution's case against either defendant. Koupal testified that Mack removed from his pocket "Some keys and a small pocketknife . . . and a few odds and ends." To the extent the evidence at the suppression hearing bore upon the arrest of Mack, it focused entirely on the legality of the seizure of the credit cards extracted from his pocket. Defendants do not contend directly or inferentially that the property taken from Mack's pockets, with the exception of the credit cards, had any evidentiary value in relation to either charged or suspected offenses. Nor does it appear from our review of the record that such a contention was made in the trial court. In effect then, the "challenge" to that evidence was strictly perfunctory.[3]

Accordingly, we are not confronted with the situation dealt with in *People* v. *Hill* (1974) 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1]. In the *Hill* case, the court refused to apply the harmless error doctrine on appeal after a bargained-for plea of guilty where the trial court had erroneously declined to suppress a relatively small part of otherwise admissible evidence. (*Id.,* at pp. 767-770.) There, however, the inadmissible evidence was relevant to the charges and the prosecutor had signaled his intention to offer it. (*Id.,* at p. 767, fn. 36.) By contrast the keys, small pocketknife and odds and ends retrieved from Mack neither added to the prosecution's case nor detracted from that of the defendants. A reversal for failure to declare the "inadmissibility" of items which do not in any event constitute evidence is not required by the rationale of the *Hill* decision. *People* v. *Rios* (1976) 16 Cal.3d 351 [128 Cal.Rptr. 5, 546 P.2d 293], which involved the erroneous refusal to suppress a large quantity of illegal drugs is similarly distinguishable.

We consider next the legality of the seizure of the credit cards from Mack's pocket. Had Koupal detected a hard object similar to a common weapon in his original pat-down search, he could lawfully have seized it. Had he then detected an object which from specific, articulable facts could reasonably be suspected to be an atypical weapon, he could lawfully have seized it. The credit cards were extracted from Mack's left front pants pocket after a second pat-down of that area disclosed a rectangular hard object which had obviously escaped detection in the initial frisk. The second pat-down was precipitated by Koupal's visual observation of a rectangular bulge in Mack's left front pocket. It did not come to his attention as a result of his unlawful direction to Mack to

---

[3]Davidson's written motion to suppress in which Mack joined was directed, inter alia, to "all items found as a result of the detention and arrest of JAMES MACK on January 28, 1975 by Detective KOUPAL."

empty his pockets.[4] Koupal felt the object was a container that might be holding a weapon of some type. We must thus determine whether, under all the circumstances, Koupal's belief was reasonable so as to enlarge the permissible scope of search from a pat-down to an intrusion into Mack's pocket to retrieve the hard object. (See *People* v. *Maher* (1976) 17 Cal.3d 196, 201-202 [130 Cal.Rptr. 508, 550 P.2d 1044].)

In resolving this question, we are bound by decisions of our Supreme Court in which the identical issue has been decided on largely similar facts. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) In *People* v. *Hill, supra,* officers succeeded in stopping a vehicle after a high-speed chase in which the fleeing vehicle had taken extremely dangerous evasive action to frustrate the pursuit. There were two occupants in the vehicle. While the driver was being arrested and handcuffed by one officer, the passenger alighted and approached another officer who ordered him to halt and conducted a pat-down search for weapons. During the course of the pat-down, the officer observed a large roll of money protruding from the passenger's jacket pocket. The passenger explained that he had acquired the money "wheeling and dealing." The officer felt a hard square object in the passenger's pants pocket and removed it. It was a matchbox about three inches long secured by rubber bands. It seemed unusually heavy and emitted a rattling sound when shaken. The officer opened it and found six .32 caliber bullets.

Observing that "a significant number of assassinations of officers occur when they are engaged in making routine traffic stops and investigations" (*People* v. *Hill, supra,* 12 Cal.3d at p. 745), the Supreme Court approved both the initiation and scope of the search. With respect to the scope of the search, the court explained: "We are not prepared to hold that under all the circumstances, which by then included the unexplained presence of a large roll of currency together with [the passenger's] evasive answer as to the source of the money, a prudent man could not have reasonably believed that a three-inch long, hard object might be an instrument of assault." (*Id.,* at pp. 746-747.)

In addition to the unsatisfactorily explained presence of a large amount of money, the circumstances in *Hill* against which the reason-

---

[4] A different issue would be presented had Mack himself produced the credit cards in response to Koupal's unlawful order before Koupal noticed the bulge in his pocket and acted upon his observation.

ableness of the officer's belief must necessarily have been measured included the high-speed chase of a vehicle in which the subject was a passenger, the fact that the driver and passenger were the only occupants of the fleeing vehicle, the presence of at least three officers on the scene when the search took place, and the fact that at the time the passenger was searched, he "was not suspected of any crime." (*Id.,* at p. 767.) These circumstances justified a pat-down of the passenger for the protection of the officers and others at the scene. There was no reason at that time to remove the passenger in custody from the scene or to prevent him from leaving after a reasonable investigatory detention.

The present circumstances are even more strongly evocative than those in *Hill* of a belief that the object seized represented a potential danger to the officer. Here, a single officer confronted a subject under arrest who was accompanied by three companions; he anticipated the need to transport the arrestee from the scene in a vehicle unequipped to afford security for transportation of prisoners; he was aware of circumstances (admittedly inadequate to constitute probable cause, but sufficient reasonably to sharpen his apprehension for his own safety) suggesting his prisoner's involvement in illegal activities more serious than mere traffic violations. Accordingly, when Officer Koupal felt a hard rectangular object in Mack's pocket, his apprehension that it might contain an offensive weapon was reasonable, and he was justified in seizing it from Mack's person.

### ENTRY AND SEARCH OF THE RESIDENCE AT 34TH AND "W" STREETS

After the arrest of Mack, Koupal sent Detectives Blanas and Joines to watch the residence at 34th and "W" Streets. Blanas observed one Julian Gallardo leave the residence, get into a car and drive away. About two weeks before, Blanas had arrested Gallardo for driving with a suspended driver's license. (Veh. Code, § 14601.) Before that he had arrested Gallardo for possession of heroin. Blanas followed Gallardo, stopped him, ascertained that his license was still suspended and arrested him for violation of Vehicle Code section 14601.

Gallardo told the officers that his girl friend lived at the residence at 34th and "W" Streets. He denied knowledge of any stolen property there. Nonetheless, the officers arranged with Gallardo to return to the house with Officer O'Hare, an undercover officer, whose entry therein he

would secure so that O'Hare could attempt to purchase some stolen property. In consideration for his assistance, the officers promised Gallardo that they would inform the district attorney of his cooperation. Gallardo was advised that he remained under arrest and would be taken to jail and booked on the traffic violation when he had performed his agreed-upon role.

Thereafter, Gallardo and Detective O'Hare went to the front door of the residence. By that time, Officer Koupal, who apparently had done with Mack, had returned to the scene. He followed O'Hare and Gallardo up the walk. Blanas stood to the side of the house and Joines was stationed at the rear. Gallardo knocked on the front door. A woman's voice from inside said, "Come in." Gallardo opened the door about a foot, leaned his head inside and spoke to the woman inside in Spanish. Following that, he jumped inside the house and slammed the door in O'Hare's face. O'Hare opened the door and entered, followed by Koupal and Blanas. Joines, at the rear of the house, heard grunting, yelling and crashing sounds from inside. Fearing for the safety of his fellow officer, Joines entered the back door. Inside, he observed Gallardo in the living room just inside the front door. He was again in custody and was being handcuffed.

Immediately thereafter, Mrs. Garcia called out from a bedroom to find out what was going on. Joines went to the bedroom and identified himself. He ascertained that Mrs. Garcia either rented or owned the house. He informed her that the officers believed there was stolen property in the house. She denied that there was stolen property there. Referring to stereo equipment in plain view in the bedroom, she volunteered that it did not belong to her, that "some woman had brought it in there to get it in out of the rain." Joines asked Mrs. Garcia's permission to search the house. She consented and Joines read to her a consent form which she signed. The stereo equipment, identified as stolen the previous day in the Conklin burglary, was seized.

■ The intended purpose for O'Hare's entry into the residence, in the feigned role of a lawbreaker, was to investigate the presence of stolen property therein. No less a giant of civil liberties than the late Chief Justice Warren once declared: "[I]t has long been acknowledged by the decisions of this Court . . . that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." (*Lewis* v. *United States* (1966) 385 U.S. 206, 208-209 [17

L.Ed.2d 312, 315, 87 S.Ct. 424].) Chief Justice Hughes had earlier observed: "Artifice and stratagem may be employed to catch those engaged in criminal enterprises. [Citations.] The appropriate object of the permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic . . . the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law." (*Sorrells* v. *United States* (1932) 287 U.S. 435, 441-442 [77 L.Ed. 413, 416-417, 53 S.Ct. 210, 86 A.L.R. 249].)

No warrant is required when a law enforcement officer, concealing his identity, enters a suspect's house and purchases contraband therein. The Fourth Amendment provides no protection from a " 'wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' " (*United States* v. *White* (1971) 401 U.S. 745, 749 [28 L.Ed.2d 453, 457, 91 S.Ct. 1122], quoting from *Hoffa* v. *United States* (1966) 385 U.S. 293, 302 [17 L.Ed.2d 374, 382, 87 S.Ct. 408]; see also *People* v. *Metzger* (1971) 22 Cal.App.3d 338, 341-345 [99 Cal.Rptr. 264].) It would have been perfectly proper for Officer O'Hare to have gained entry to the residence to purchase stolen property by representing himself as one outside the law. Nor would the legality of the entry be altered by assistance in the endeavor from Gallardo, who was in custody only for a misdemeanor and who was known to, and obviously trusted by, the occupants of the house.

In the event, O'Hare was compelled by Gallardo's sudden betrayal to abandon his masquerade and revert to type. Gallardo was under arrest and in custody when he escaped, unexpectedly bolting into the house. The officers therefore were entitled by the exigencies of the situation immediately to enter the house in hot pursuit of the escapee in order to rearrest him. (Pen. Code, § 854; *People* v. *Cannedy* (1969) 270 Cal.App.2d 669, 675 [76 Cal.Rptr. 24]; see *United States* v. *Santana* (1976) 427 U.S. 38 [49 L.Ed.2d 300, 305-306, 96 S.Ct. 2406]; *Warden* v. *Hayden* (1967) 387 U.S. 294, 298 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 706 [47 Cal.Rptr. 909, 408 P.2d 365], cert. granted on other grounds, *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333].)[5]

Officer Joines' entry was likewise justified by the exigencies of the situation. He was privy to the original plan involving O'Hare and

[5]The arrest took place January 28, 1975. Accordingly, apart from the manifest need for immediate action, the rule announced in *People* v. *Ramey, supra,* has no application to this case. (*People* v. *Ramey, supra,* 16 Cal.3d at p. 276, fn. 7.)

Gallardo. Inferentially, he was unaware it had misfired until he heard a commotion in the house. The circumstances known to him justified a belief that his fellow officer within the house was in imminent peril of bodily harm. (*Ker* v. *California* (1963) 374 U.S. 23, 47 [10 L.Ed.2d 726, 746, 83 S.Ct. 1623]; see *People* v. *Hill, supra,* 12 Cal.3d at pp. 754-755; *People* v. *Smith* (1972) 7 Cal.3d 282, 285-287 [101 Cal.Rptr. 893, 496 P.2d 1261].)

The officers did not delay their pursuit of Gallardo to announce their identity and purpose and demand entry into the house. However, the identity of the officers was well known to Gallardo who, we must assume, was also well aware of their purpose in entering, having himself created the necessity therefor. A demand for entry manifestly would have been futile just after the door had been slammed in O'Hare's face. Given the fact that the officers were in fresh pursuit of a rapidly absconding arrestee, there was substantial compliance with the requirements of Penal Code section 844. (See *People* v. *Bigham* (1975) 49 Cal.App.3d 73, 79-81 [122 Cal.Rptr. 252]; *People* v. *Cannedy, supra,* 270 Cal.App.2d at p. 675.)

No search or seizure was undertaken until consent had been obtained from Mrs. Garcia who, it reasonably appeared, was in control of the premises. As we have demonstrated, the officers were lawfully within the house when her consent was secured (cf. *People* v. *Haven* (1963) 59 Cal.2d 713, 718-719 [31 Cal.Rptr. 47, 381 P.2d 927]), and the actual voluntariness of Mrs. Garcia's consent is established by uncontradicted evidence.

Moreover, the stereo equipment was openly exposed to the view of officers lawfully within the house who need not blind themselves to that which is in plain sight. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 742 [102 Cal.Rptr. 385, 497 P.2d 1121].)

"SEARCH" OF THE COTNAM RESIDENCE

█ Three days after his arrest, Mack was interrogated by sheriff's detectives. He admitted the Conklin, King and Whitney burglaries and implicated Davidson in their commission. He revealed that some of the loot was at Davidson's residence on Solano Street and some of it had been removed from there to the possession of a woman named Dene. Through further investigation, the officers established that Dene Cotnam

was the woman to whom Mack had referred and that she resided on Dart Way in Orangevale.[6]

Officers placed the Cotnam residence under surveillance. Shortly thereafter, Dene Cotnam and a male companion arrived in an automobile. The officers approached them in front of the residence and advised that they were there to pick up the stolen property which Cotnam had gotten from the Davidson residence. Cotnam appeared shocked. The officers stated they were merely interested in recovering the property together with a brief statement by Cotnam from whom she received it. After conferring together, Cotnam and her companion agreed to cooperate and invited the officers into the house. While the officers drank coffee in the kitchen, Cotnam and her companion retrieved stolen property cached in the attic, placed it in pillow cases and surrendered it to the officers. The property, including furs, a television set, movie projector and household items, had been stolen in the Conklin and King burglaries.

Davidson contends the property recovered from Cotnam should have been suppressed in that it was tainted by the alleged illegality of the statement taken from Mack through which the location of the property was discovered. The further contention that the Cotnam "search" was also tainted by the allegedly illegal arrest and concurrent search of Mack has heretofore been laid to rest.

In *People* v. *Varnum* (1967) 66 Cal.2d 808 [59 Cal.Rptr. 108, 427 P.2d 772], it was said: "Noncoercive questioning is not in itself unlawful, however, and the Fifth and Sixth Amendment rights protected by *Escobedo, Dorado* and *Miranda* are violated only when evidence obtained without the required warnings and waiver is introduced *against the person whose questioning produced the evidence.* The basis for the warnings required by *Miranda* is the privilege against self-incrimination. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 457-470 [16 L.Ed.2d 694, 713-721, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and that privilege is not violated when the information elicited from an unwarned suspect is not used *against him.* [Citation.] Similarly, the right to counsel protected by *Escobedo* and *Dorado* is not infringed when the exclusion of any evidence obtained through the violation of the rule of those cases precludes any interference with the *suspect's* right to effective representa-

---

[6]The officers knew that a Dene Cotnam was registered owner of the Volkswagen Mack was driving when he was arrested, and that she was one of the three people whom he had stopped to pick up when he was first accosted by Koupal.

tion (see *Massiah v. United States* (1964) 377 U.S. 201, 206-207 [12 L.Ed.2d 246, 250-251, 84 S.Ct. 1199].) Unlike unreasonable searches and seizures, which always violate the Constitution, there is nothing unlawful in questioning an unwarned suspect so long as the police refrain from physically and psychologically coercive tactics condemned by due process and do not use *against the suspect* any evidence obtained. Accordingly, in the absence of such coercive tactics, there is no basis for excluding physical or other nonhearsay evidence acquired as a result of questioning a suspect in disregard of his Fifth and Sixth Amendment rights *when such evidence is offered at the trial of another person.*" (Fn. omitted; italics added.) (66 Cal.2d at pp. 812-813.)

The *Varnum* rule disposes of two of the three grounds upon which Davidson bases his claim that the Mack statement was unlawfully obtained. Those are (1) that the statement was elicited in the absence of Mack's counsel (*Massiah v. United States, supra,* 377 U.S. 201 [12 L.Ed.2d 246])[7] and (2) that the statement was elicited without the required admonition and waiver of rights. (*Miranda v. Arizona, supra.*)

Davidson claims, however, that the Mack statement was involuntary in the traditional sense. The Attorney General does not dispute Davidson's standing to claim the benefit of this alleged denial of Mack's rights.

Mack testified that his interrogators told him that they only wanted to secure the return of the stolen property and that anything he told them would not be used against him; he was promised that if any property was recovered through his cooperation, no new charges would be filed against him; the officers also promised to talk to the district attorney about a 90-day maximum jail term upon the charges then pending against him. (Receiving stolen property, i.e., the stolen King credit cards seized by Koupal.) Mack denied that he was ever advised of his rights to counsel or against self-incrimination.

The interrogating officers testified that Mack was fully advised of his rights, specifically of his right to counsel, against self-incrimination and that anything he said "can and will" be used against him in a court of

---

[7]The evidence is in conflict whether Mack was represented by counsel when interrogated. The interrogating officers testified that Mack told them he did not then have an attorney. Mack testified that the public defender had been appointed to represent him prior to the interrogation. He denied there had been mention of an attorney at his interrogation. On appeal, Mack does not attack the confession on grounds his *Massiah* rights were violated.

law and that he acknowledged he understood and expressly waived his rights; they informed him they were interested in the return of stolen property to the victims, and they knew he had committed a couple of burglaries; they offered to talk to the district attorney about charging only one burglary; there were no threats or any other promises made; they specifically did not tell Mack that no charges would be filed as to those burglaries in which the victims recovered their property.

■ A confession motivated by a promise of leniency is involuntary and therefore inadmissible as a matter of law. (*People* v. *Rowe* (1972) 22 Cal.App.3d 1023, 1031 [99 Cal.Rptr. 816].)

It bears mention at this point that Mack's statement was not introduced either against him or against Davidson. (Cf. *People* v. *Underwood* (1964) 61 Cal.2d 113, 124-126 [37 Cal.Rptr. 313, 389 P.2d 937].) The trial court therefore never had occasion to determine its admissibility in the context in Mack's Fifth and Sixth Amendment rights. Rather, in the suppression hearing (Pen. Code, § 1538.5), the trial court was called upon to decide whether the statement was involuntary and if so, whether physical evidence was obtained by the police as a product thereof. (*People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 733-734 [125 Cal.Rptr. 798, 542 P.2d 1390]; *People* v. *Superior Court* (1970) 3 Cal.App.3d 476, 484 [83 Cal.Rptr. 771]; see *People* v. *Schader* (1969) 71 Cal.2d 761, 778 [80 Cal.Rptr. 1, 457 P.2d 841].)

Regarding the evidence, as we must, in the light most favorable to the order denying the motion to suppress, we disregard, insofar as contradicted, Mack's testimony to the effect that direct or inferential promises of leniency were made to him. There remains then only the testimony of the interrogating officers that they assured Mack they would talk to the district attorney about charging him with but one burglary (see *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97]). The trial court denied the motion to suppress based on "the totality of the circumstances, . . ." (See *People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74].) On this record we are not disposed to gainsay the findings of the trial court, implied in its order of denial, that the circumstances attending the Mack confession were not psychologically coercive and that the offer to intervene with the district attorney was not the inducing cause of the statement. The finding of voluntariness implied in the denial of the motion to suppress is not "palpably erroneous" (*People* v. *Robinson* (1969) 274 Cal.App.2d 514, 520 [79 Cal.Rptr. 213]).

Mack also sought to suppress the property recovered from the Cotnam residence, alleging that it was the direct product of his statement obtained without first complying with the procedures promulgated in *Miranda* v. *Arizona, supra,* 384 U.S. 436. As we have seen, however, evidence of compliance with *Miranda* was conflicting, the officers testifying that Mack was advised of, understood and waived his rights before interrogation. Accordingly, the trial court's implied finding of compliance with *Miranda* is supported by substantial evidence.

██ We reject Davidson's contention that Cotnam acceded to a search of her house only in the face of an implied assertion of authority by the police. The record is uncontradicted that no search took place. Instead, Cotnam and her companion voluntarily gathered up and surrendered the stolen property to the officers. There were no invasions by the officers of any constitutionally protected areas.

### SEARCH OF THE SOLANO STREET RESIDENCE

On February 4, 1975, the search warrant referred to earlier in this opinion was obtained and executed at Davidson's residence located on Solano Street in Bryte, Yolo County. Certain of the property seized there was identified as stolen from the Whitney and Conklin residences. Other evidence taken in the search tended to associate both defendants with the premises. Among the items seized in the garage was a pair of bolt cutters belonging to Davidson. At trial this tool was identified by expert testimony as the one which had been used in the King burglary to cut the padlock on the King garage.

Both defendants sought suppression of this evidence on the ground that information in the search warrant affidavit essential to constitute probable cause derived directly from the allegedly illegally obtained Mack confession. The contention fails in light of our previously explained conclusions that Davidson's standing to complain is limited to the issue of traditional voluntariness, that the trial court's finding of voluntariness implied in the order denying the motion to suppress is not palpably erroneous, and that the confession was not obtained under circumstances violative of Mack's *Miranda* rights.

At this point we have treated with all of the contentions raised on this appeal by Mack. All of the following discussion relates solely to the appeal of Davidson.

It is urged that the search of the garage in which the bolt cutters were seized exceeded the scope of search authorized by the warrant. The warrant commanded a search of "the premises located and described as 616 Solano St., Bryte, CA., a frame house, single story, dirty white in color, on the West side of Solano St., with a detached garage." The word "premises" as used in the warrant embraces both the house and garage (see *People* v. *Atwood* (1963) 223 Cal.App.2d 316, 323-324 [35 Cal.Rptr. 831]). The language employed in the warrant was sufficiently precise to enable the executing officers with reasonable effort to ascertain the places to be searched. (*Steele* v. *United States* (1925) 267 U.S. 498, 503 [69 L.Ed. 757, 760, 45 S.Ct. 414]; *People* v. *Fitzwater* (1968) 260 Cal.App.2d 478, 485-488 [67 Cal.Rptr. 190].)

It is further argued that the bolt cutters were illegally seized because they were not specifically referred to in the warrant and did not constitute stolen property. The search warrant authorized seizure of particularly described items of property stolen in the Conklin and King burglaries. The search warrant affidavit disclosed that the burglars had cut the padlock from the King garage with a bolt cutter. The bolt cutters seized in Davidson's garage thus constituted relevant evidence of the King burglary. They were in plain view and were subject to seizure by officers, such as these, who had a right to be in the position from which the bolt cutters were observed. (*Skelton* v. *Superior Court, supra,* 1 Cal.3d at p. 157; *Guidi* v. *Superior Court* (1973) 10 Cal.3d 1, 14-16 [109 Cal.Rptr. 684, 513 P.2d 908]; *People* v. *Miller* (1976) 60 Cal.App.3d 849, 852-854 [131 Cal.Rptr. 863]; *People* v. *Senkir* (1972) 26 Cal.App.3d 411, 420 [103 Cal.Rptr. 138].)

We have examined the search warrant affidavit in response to Davidson's claim that the facts stated therein are insufficient to constitute probable cause. Construing the affidavit as we must in a commonsense rather than a hypertechnical manner (*People* v. *Superior Court (Johnson), supra,* 6 Cal.3d at p. 711), we conclude that it sets forth in competent fashion reasonable grounds for suspecting that the described property was stolen in the King and Conklin burglaries and was located at Davidson's house.

MISCELLANEOUS CONTENTIONS OF DAVIDSON

During the investigation of these offenses, police showed Jeffrey Moore, a witness to the Whitney burglary, a series of photographs

including one of Davidson. Because Moore was unable to make an identification, the officer did not book the photographs as evidence but returned them to file without recording which ones had been used in the lineup. Accordingly, with the exception of Davidson's photograph, it was impossible to retrieve them and reconstruct the photographic lineup shown to Moore. Davidson claims that unavailability of these pictures prevented him from attacking the fairness of the photographic identification procedures.

After a hearing outside the presence of the jury, the trial court overruled Davidson's objections to Moore's in-court identification. Findings are implicit in the trial court's ruling that the commingling of the lineup photographs with numerous others in the main file without creating a record permitting their later retrieval was done in good faith, and that the photographs did not constitute evidence substantially material to any issue before the court. (See *People* v. *Ruthford* (1975) 14 Cal.3d 399, 409 [121 Cal.Rptr. 261, 534 P.2d 1341]; *People* v. *Wright* (1976) 60 Cal.App.3d 6, 16 [131 Cal.Rptr. 311].) Moreover, the trial court found that Moore's in-court identification was the product of his observation of Davidson at the scene of the Whitney burglary. There is substantial evidence in the record to support all of these findings and accordingly we find no error in the admission of Moore's identification of Davidson. (*People* v. *Citrino* (1970) 11 Cal.App.3d 778, 783 [90 Cal.Rptr. 80].)

Davidson's further claim that he was deprived of the right to a lineup (*Evans* v. *Superior Court* (1974) 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681]) is not supported by the record.

Davidson claims he was improperly impeached by the prosecution at trial. In his defense, Davidson testified that he had not been living at the Solano Street address. In rebuttal, a Mr. Dodson testified for the People that he had spoken to Davidson in September 1974 and he had given the Solano Street residence as his address. Just before Dodson testified, the prosecutor called Davidson to the stand and asked him specifically about the Dodson conversation. Davidson denied any recollection of it. There was no objection to the calling of defendant as a witness or to the questions which were asked. Without bothering to explain how, Davidson contends the procedure employed denied him due process.

Certainly the calling of Davidson as a witness in the prosecution's rebuttal case was improper, even though by voluntarily testifying in his defense, Davidson had waived his privilege against self-incrimination. (Cf. *People* v. *Talle* (1952) 111 Cal.App.2d 650, 663-667 [245 P.2d 633].) The questions asked of him would have been proper on cross-examination but the prosecutor obviously neglected to ask those questions when he had the opportunity. Apparently he believed that Dodson's impeaching testimony of a prior statement inconsistent with Davidson's testimony would not be admissible unless Davidson was first given an opportunity to explain or deny it. (Evid. Code, § 770.) In that belief he was mistaken.

The defendant in a felony criminal action is never "excused from giving further testimony" within the meaning of Evidence Code section 770. subdivision (b). That is to say, as the defendant, he is always available to explain or deny evidence of a prior inconsistent statement. However, whether he takes the stand or, having completed his testimony, resumes the stand to do so, must be solely at his election. Thus the Dodson testimony could have been properly received without first inquiring of defendant about it. If defendant then desired to explain or deny it, he could have done so in surrebuttal.

The prosecutor was wrong in calling defendant to the stand. However, in view of defendant's earlier voluntary assumption of the stand in his own behalf, the error does not require reversal where, as here, there has been no objection in the trial court. As we have explained, Davidson had already waived his privilege against self-incrimination and could have been examined on cross-examination concerning the same subject matter. In practical effect, the erroneous procedure accomplished nothing more than could have been done had the trial court granted a request to recall the defendant for further cross-examination. (See Evid. Code, § 778; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 350-352 [23 Cal.Rptr. 779, 373 P.2d 867].) The error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The verdict of the jury on count V of the information found Davidson guilty of burglary in the second degree (Whitney burglary). The abstract of judgment recites a conviction of burglary in the first degree. The trial court is ordered to correct the abstract of judgment to show a conviction

of burglary in the second degree as to count V of the information and to furnish a certified copy thereof to the Department of Corrections.

No other contentions of defendants require discussion.

The judgments are affirmed.

Paras, J., and Evans, J., concurred.

A petition for a rehearing was denied February 28, 1977, and on March 3, 1977, the opinion was modified to read as printed above. The petition of appellant Davidson for a hearing by the Supreme Court was denied April 7, 1977.