[Civ. No. 17718. Third Dist. Aug. 7, 1978.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF PLUMAS COUNTY, Respondent;
SAMUEL R. QUINN, JR., et al., Real Parties in Interest.

610

**COUNSEL**

Evelle J. Younger, Attorney General, Garrick W. Chock and Edmund D. McMurray, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Robert Eli, under appointments by the Court of Appeal, for Real Parties in Interest.

## OPINION

PUGLIA, P. J.—The People petition for relief from the order of the trial court suppressing evidence in a criminal prosecution in which the real parties in interest, Samuel and Diana Quinn, are defendants. The questions presented in this proceeding concern the legality of the arrests of defendants and one Rodney Lee. Extraordinary relief is the appropriate remedy for the People in these circumstances (Pen. Code, § 1538.5, subd. (o)). We have issued an alternative writ and stayed further proceedings in the trial court pending our further order.

Shortly after noon on January 25, 1978, a 1974 model Porsche was stolen in Oakland. In Quincy, at approximately 10:50 the following morning, Deputy Sheriff Gamberg, on patrol in a sheriff's car, observed the Porsche parked behind a storage shed in back of the Fun and Games Arcade (Arcade). The Arcade building houses a commercial entertainment establishment and separate living quarters for the proprietors who at the time of these events were the defendants Quinn.

The Porsche was substantially concealed from view from the street. Gamberg, a veteran officer, had never before seen this vehicle. A citizen informant, the former owner of the local bus station, told Gamberg no one had been at the Arcade the previous afternoon and evening, nor had the Porsche been there the previous day. There were two puppies and some clothing in the car. In answer to his inquiry, Gamberg was informed by the radio dispatcher that the Porsche had been stolen the day before in Oakland. Gamberg placed the Porsche under surveillance. Ten to fifteen minutes elapsed and Rodney Lee walked up to the driver's side of the car and reached down as if to open the door.

Gamberg and Lee had become acquainted through prior official contacts. Within the last two weeks, Gamberg had arrested Lee for automobile burglary. One week previously, Gamberg had occasion to stop Lee and he was armed with an automatic 12-gauge shotgun. On an earlier occasion, when Gamberg attempted to serve an arrest warrant on Lee in a residence, Lee fought the officer, ran into another room and grabbed a 22-caliber magnum rifle before he was caught and disarmed. In addition, Gamberg was aware of citizen complaints of persons firing guns and carrying loaded firearms on the Arcade premises. Gamberg knew that Lee had been staying at the Arcade.

Gamberg suspected that Lee was involved in the theft of the Porsche and wanted to talk to him about it. He approached unobserved on foot, and when about 15 feet from Lee stated, "Rodney, I want to talk to you." Lee looked directly at Gamberg, turned and ran toward the Arcade; Gamberg pursued, shouting for him to halt. At this point Gamberg intended to arrest Lee for theft of the Porsche. Lee entered the kitchen portion of the private living area of the Arcade building and slammed the door in Gamberg's face. As he entered, Lee shouted, "It's the cops."

Gamberg, in uniform, caught the door as it slammed shut and pulled it open. He was surprised to see the two defendants with Lee in the kitchen and adjoining bedroom. Concerned for his own safety as well as that Lee might escape, Gamberg withdrew from "the line of fire," drew his service revolver, and ordered the occupants to freeze and come out with their hands in plain sight. He received no response. Instead there was commotion and scrambling around in the bedroom, to which Diana Quinn appeared to be attempting to block Gamberg's view. At this point, Gamberg lost sight of Lee.

Gamberg's concern that Lee might avoid apprehension arose from his familiarity with the Arcade building and his knowledge that there were many doors and windows through which he might escape. His fear for his own safety was stimulated by his concern, based on past experience with Lee, that Lee (or one of the defendants) might obtain a weapon within the building and use it against him. As Gamberg himself explained, "I had occasion before with Mr. Lee, I had to take a firearm away from him the last time he ran into a building, and I was just a little bit cautious as though it would happen again."[1]

At this point Gamberg called for assistance on his walkie-talkie. Within moments Sergeant Stoy arrived. After repeated orders to vacate the premises, Diana Quinn and then Samuel Quinn exited the building and were arrested by Sergeant Stoy for theft of the Porsche. A search of Samuel Quinn's person produced a key that fit the ignition of the Porsche.

---

[1] As it turned out, Gamberg's concern was further confirmed by the ensuing search which turned up a 25-caliber automatic pistol and ammunition in the bedroom where Samuel Quinn and Lee had been and to which Gamberg's view was blocked by Diana Quinn. The pistol is the basis for the charges against Samuel Quinn of possession of a concealable firearm by a convicted felon (Pen. Code, § 12021) and alteration of identifying marks on a firearm (Pen. Code, § 12090).

At the time of the Quinn arrests, Sergeant Stoy knew from hearing the radio dispatcher's report to Gamberg that the Porsche had been stolen in Oakland the day before; he knew from monitoring one of Gamberg's radio transmissions that he had chased "suspects" from the area of the Porsche into the building; he learned from Gamberg that neither the Porsche nor the occupants of the Arcade had been there the night before but that the car and occupants showed up that morning; he knew the car was parked at the Arcade premises and there were two puppies inside, indicating to him that the people who had taken the car were in the immediate area; he observed Gamberg with pistol drawn order the occupants out of the Arcade building; he also knew the Quinns resisted orders to vacate the building; he suspected the occupants of the Arcade were involved in the theft of the Porsche.

Immediately after the removal and arrest of the Quinns, Gamberg, armed with Stoy's shotgun, entered the Arcade to search for and arrest Rodney Lee. In plain sight in the bedroom Gamberg observed various items of apparent contraband, including pills, drug injection paraphernalia, and a glove whose mate he had observed in the Porsche. Leaving these items where he found them, Gamberg proceeded to the commercial area of the Arcade where he found Lee and arrested him for auto theft and removed him in custody from the building. Gamberg then returned directly to the bedroom and retrieved the evidence he had earlier observed. Nothing else was taken and further search was deferred until a search warrant was obtained. Other items of contraband and evidence tending to connect defendants with the stolen car were recovered under the search warrant.

No more than 10 to 15 minutes elapsed between Gamberg's initial encounter with Lee at the stolen automobile and the seizure of the items in the bedroom.

In the superior court defendants are each charged with unlawful taking of an automobile (Veh. Code, § 10851) and possession for sale of controlled substances (Health & Saf. Code, § 11351). In addition, defendant Samuel Quinn is charged with possession of a concealable firearm by a convicted felon (Pen. Code, § 12021) and unauthorized alteration of identifying marks on a firearm (Pen. Code, § 12090).

In the suppression hearing in the trial court, defendants argued that Gamberg's entry into the Arcade to arrest Lee was illegal because (1) no exigent circumstances existed to justify the warrantless arrest; and (2)

Gamberg failed without excuse to comply with the knock-notice requirement of Penal Code section 844. The trial court granted the motions to suppress. We shall first determine in the context of the factual background set out above whether defendants' trial court contentions have merit.

■ When Deputy Gamberg first observed Lee at the stolen Porsche, he sought to detain and question him about the vehicle, suspecting that Lee was somehow involved with its theft. He knew the Porsche had been stolen the previous day, had been brought to its present location shortly before, and that whoever had brought it there very likely remained in the near vicinity; the automobile was parked on the premises of the Arcade and was largely screened from public view by the storage shed; Lee had been staying at the Arcade and was personally known to Gamberg through his previous brushes with the law; when Lee approached the vehicle as if to open the door, Gamberg's suspicion that he was somehow involved with the theft of the vehicle was rationally based and he had no reasonable alternative but to question Lee about it. (*People* v. *Harris* (1975) 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 668]; *People* v. *Moreno* (1977) 67 Cal.App.3d 962, 966-969 [134 Cal.Rptr. 322], hg. den. May 5, 1977.)

■ The detention of one suspected of criminal activity is justified by a less demanding standard than is required to justify an arrest. However, there is no mechanical formula of general applicability by which to determine precisely when a rational suspicion of criminal activity may by the accretion of available information reasonably ripen into probable cause to arrest. The answer depends upon all the circumstances, and each set of circumstances is unique. ■ Given the information known to Gamberg, he was justified in entertaining a healthy suspicion of Lee's involvement with the theft of the Porsche. When he attempted to question Lee at the automobile and Lee, who knew Gamberg from past contacts, turned tail and ran toward the Arcade, Gamberg's subjective belief that he then had legally sufficient cause to arrest Lee for auto theft was objectively validated.

Given Lee's flight, Gamberg had a choice of two lawful alternatives: to attempt to arrest Lee forthwith or to withdraw, secure a warrant and hope that the delay would not allow Lee to evade arrest. Given the seriousness of the offense and his duty to enforce the law, it was inevitable that Gamberg would pursue the first alternative. Because Lee disregarded Gamberg's order to halt, Gamberg had no reasonable choice but to

pursue him wherever he went to effect the arrest. Where Lee went, of course, was into the Arcade, seeking sanctuary in the residential quarters. Gamberg first attempted to arrest Lee in a public place; Lee's flight into defendants' residence therefore could not thwart an otherwise lawful arrest. (*United States* v. *Santana* (1976) 427 U.S. 38, 43 [49 L.Ed.2d 300, 305, 96 S.Ct. 2406]; *People* v. *Mack* (1977) 66 Cal.App.3d 839, 853 [136 Cal.Rptr. 283].) As in the *Santana* and *Mack* cases, this is a true case of hot pursuit; immediate apprehension and arrest were necessary to forestall the imminent escape of the suspect (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333].)

■ Furthermore, under these circumstances Gamberg was excused from literal compliance with Penal Code section 844. He was in uniform; moreover he was known to Lee as a peace officer; under the circumstances, Gamberg's purpose in entering the residence was most certainly known to Lee whose conduct rendered futile any demand for admittance. (*People* v. *Mack, supra,* 66 Cal.App.3d at p. 854.)

When Gamberg opened the door through which Lee had just fled, he encountered a situation which reasonably appeared to threaten his safety. His awareness from past experience of Lee's penchant for arming himself contributed to his apprehension, which was further heightened by the unanticipated presence of the defendants, apparent allies of Lee, who refused to respond to orders of Gamberg reasonably calculated to neutralize the threat they posed to his safety. Gamberg was under no duty to concede the first and perhaps only shot to his adversaries before he could act to insure his own safety.

■ With the assistance of Sergeant Stoy, the defendants Quinn were removed from the Arcade and arrested for auto theft. The arrests were lawful. The presence of the recently stolen Porsche concealed from public view on the Quinns' property, its arrival coincident with the return of the Quinns, the indications that the thief or thieves were nearby, the manifest involvement of Lee who had been living with defendants at the Arcade and his headlong flight into their residence seeking sanctuary and alerting defendants to the presence of "the cops," the resistance of the Quinns to Gamberg's lawful orders and their apparent efforts to aid Lee's escape, all taken together, constitute probable cause to arrest them for auto theft.[2]

_____

. [2]Even if unlawful, the arrest of defendants would not have rendered unlawful the officer's later entry into the Arcade to arrest Lee; in that event the only evidence subject to suppression would have been the keys to the Porsche which were seized from defendant Samuel Quinn's person incident to his arrest.

■ Gamberg's entry into the Arcade immediately followed the removal therefrom of the Quinns and the neutralization of the threat they posed to the officers. Gamberg's observation of contraband in the bedroom occurred as a result of his search there for Lee; he observed what was in plain view from a position where he had a lawful right to be. Gamberg obviously had the right to bag, tag and seize the evidence then and there. That he did not do so no doubt can be ascribed to his primary concern with the apprehension of Lee whom he believed still to be within the building and who may well by then have armed himself. Having arrested Lee and removed him from the building, Gamberg did not trench upon any constitutionally protected interest by returning for the single purpose of retrieving the items of contraband he had observed moments before in the bedroom but had not then been in a position to seize.

We conclude that the entry into the Arcade and the observation in plain view therein of contraband and the arrests of the defendants and of Lee were lawful. Accordingly, the search warrant which was based on the information set out hereinabove was also valid.[3] We further conclude that on the facts stated hereinabove the defendants' trial court challenges to the validity of the various searches were without legal merit.

These conclusions do not resolve this proceeding however. In reviewing a ruling on a suppression motion we are bound to accept only those facts in the record and the inferences reasonably to be drawn therefrom which support the ruling of the trial court. Here the evidence before the trial court was uncontradicted. It consisted entirely of evidence presented by the People. Deputy Gamberg and Sergeant Stoy testified both at the preliminary examination (the record of which was by stipulation considered by the trial court on the suppression motion) and at the de novo hearing in superior court. Excepting minor and inconsequential variances of the sort encountered in virtually all testimony, the testimony of each officer is internally consistent as well as consistent with that of the other. Thus facts and inferences drawn from the record can be stated in only one way.

---

[3]A bread bag containing a syringe and needle (People's exhibit No. 16, at the preliminary examination) found on the ground next to the stolen Porsche would be admissible even if the searches of the Arcade, both with and without a warrant, were illegal. Evidence recovered in the search of the stolen Porsche would also not be affected were the other searches found to be unlawful.

In this proceeding, defendants argue that the trial court must perforce have disbelieved Gamberg and Stoy as to those matters crucial to the establishment of probable cause and exigent circumstances. Certainly the trial court's order granting the suppression motion does not eliminate that possibility. The trial court's ruling cryptically ordered "that the motion be GRANTED suppressing the evidence as described in the written motion."

The lack of any findings renders impossible meaningful review of the trial court's ruling. If the trial court believed the People's witnesses, it erred as a matter of law in ordering suppression and the People should prevail in this proceeding; if the trial court did not credit the testimony of the People's witnesses the order of suppression should be affirmed. We could, of course, assume the latter scenario in support of the trial court's ruling, affirm the order of suppression, and be done with it. However, we are not disposed to do so on a record consisting entirely of uncontradicted evidence containing not the slightest hint on its face that the People's witnesses were unworthy of belief or in fact disbelieved by the trial court. Such an undiscriminating disposition might perpetuate a serious error of law and, worse yet, wrongfully deprive the fact finder of the benefit of probative evidence highly relevant in the trial of serious charges and most probably essential to the ascertainment of the truth. Such a course would not serve the cause of justice and would certainly impair public confidence in the ability of the judicial system to fulfill its promise to ascertain rather than to frustrate the truth.

The disposition which we adopt will not result in prejudice to defendants. If the trial court based its order on a credibility determination, defendants will receive the full benefit thereof; if the trial court's order reflects the erroneous application of legal principles to the facts, defendants are not prejudiced by being deprived of that to which they are in no event entitled.

Let a peremptory writ issue directing the trial court to vacate the order of suppression and reconsider its ruling in the light of this opinion. The stay previously issued will remain in effect pending finality of this opinion. The order to show cause, having served its purpose, is discharged.

Paras, J., concurred.